*Pursuant to Indiana Appellate Rule 65(E), the trial court and parties shall not take any action in reliance upon this opinion until it is certified.*




FILED

Jun 29 2026, 2:30 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

I N   T H E

# Indiana Supreme Court

Supreme Court Case No. 24S-TA-382

## PENN Entertainment, Inc.
## (f/k/a Penn National Gaming, Inc.),
*Petitioner,*

—v—

## Indiana Department of State Revenue,
*Respondent.*

Argued: January 16, 2025 | Decided: June 29, 2026

On Petition for Review from the Indiana Tax Court
No. 22T-TA-15
The Honorable John G. Baker, Special Judge

**Opinion by Justice Molter**

Chief Justice Rush and Justices Massa, Slaughter, and Goff concur.

**Molter, Justice.**

All but a handful of states levy a corporate income tax. And when states tax income from interstate commerce, the federal constitution requires them to apportion that income. That is, they must calculate which portion of income is connected to the taxing state, and then they can tax only that portion. They can't tax income sourced to other states.

To comply, states typically have corporate taxpayers start with the taxable income they report on their federal tax return. States then apply a statutory formula calculating their share of that federal taxable income. Finally, they apply the tax rate to their state's portion only.

That leaves one problem, though. Taxpayers deduct state income taxes from federal taxable income. By starting with federal taxable income, then, a taxing state is apportioning income that is missing income that other states already taxed. That is like trying to calculate the size of a state's slice of pie after other states have already taken bites.

For a more accurate apportionment, the taxing state needs to calculate its portion *before* other states' apportioned income taxes have been removed, not after. So before applying their apportionment formulas, almost all states with a corporate income tax require the taxpayer to add back the state income tax deduction from the federal return. Indiana does that through standard statutory language, directing corporate taxpayers to add to their federal taxable income "an amount equal to any deduction or deductions allowed or allowable pursuant to Section 63 of the Internal Revenue Code for taxes based on or measured by income and levied at the state level by any state of the United States." Ind. Code § 6-3-1-3.5(b)(3).

In this case, PENN Entertainment, Inc. ("Penn") added back the apportioned income taxes it paid to other states in the relevant tax years. The question here is whether Penn must also add back *un*apportioned wagering taxes it paid to other states—that is, excise taxes on *intra*state transactions that are not subject to an apportionment formula. We hold the statute does not require adding back these taxes because they are neither income taxes (taxes "based on" income) nor the functional equivalent of income taxes (taxes "measured by" income).

# Facts and Procedural History

Undisputed, foundational tax principles provide critical context for resolving this case. And to explain those concepts, Penn offered analysis from Professor Richard Pomp, a state-tax-law expert who is a tenured professor at the University of Connecticut Law School. App. Vol. 7 at 62–108; *see also* Richard D. Pomp, *State Corporate Income Taxes: The Illogical Deduction for Income Taxes Paid to Other States*, 42 Tax L. Rev. 419 (Winter 1987). The Indiana Department of State Revenue ("the Department") agrees that Professor Pomp's analysis is "academically sound." App. Vol. 3 at 29. So we begin this background discussion by explaining in Part I the undisputed foundational tax concepts underlying Indiana's statutory requirement to add back the federal deduction for state income taxes, and then we describe the facts and procedural history of this case in Part II.

## I. Add-Back Statutes for State Income Taxes

Both sides agree there are two reasons Indiana Code section 6-3-13.5(b)(3) requires adding back the federal deduction for state income taxes. One reason is to ensure the State accurately calculates its income apportionment. The other reason is to ensure the State taxes corporations generating interstate revenue the same as corporations generating revenue only intrastate. To explain how the statute serves those two purposes, we start by describing how states calculate taxable income (Part I.A) and then apportion their share of that income (Part I.B). We then explain why adding back the federal deduction for state income taxes is necessary for a fair apportionment (Part I.C) and why adding back that deduction is necessary only for apportioned state income taxes and not other unapportioned business expenses, including unapportioned taxes (Part I.D).

### A. Adjusted Gross Income (the "Taxable Pie")

The taxes the Department contends Penn underpaid are taxes levied under the Indiana Adjusted Gross Income Tax Act of 1963, I.C. § 6-3-1-1 *et seq.*, which are "traditional net income tax[es], like ones adopted by other

states." App. Vol. 7 at 99; *see also Columbia Sportswear USA Corp. v. Ind. Dep't of State Revenue*, 45 N.E.3d 888, 895 (Ind. T.C. 2015) (explaining how Indiana taxes a "net income tax base" (emphasis omitted)). The tax rate ranged from 6 to 7% during the relevant tax years. I.C. § 6-3-2-1(c)(4)–(7).

Under the Act, a corporation pays the tax rate "on that portion of its adjusted gross income derived from sources within Indiana." *Consolidation Coal Co. v. Ind. Dep't of State Revenue*, 583 N.E.2d 1199, 1200 (Ind. 1991). A corporation's "gross income" is "all income from whatever source derived." I.R.C. § 61(a); I.C. § 6-3-1-8 (adopting the federal definition). Its "adjusted gross income" is its "[g]ross income minus allowable deductions specified in the tax code," *Adjusted gross income*, Black's Law Dictionary (12th ed. 2024), which the Indiana Code identifies in section 6-3-1-3.5. Closely related, a corporation's net income is its "[t]otal income from all sources minus deductions, exemptions, and other tax reductions." *Net income*, Black's Law Dictionary (12th ed. 2024).

The first step in calculating a state's corporate net income tax is to determine the tax base, which is its adjusted gross income. App. Vol. 7 at 96–97; I.C. §§ 6-3-2-1(c); Jerome R. Hellerstein & Walter Hellerstein, *State Taxation* 8-71 (3d ed. Supp. 2013). That base is what will be apportioned and then taxed. Generally speaking, the tax base is the annual worldwide profit (net income). App. Vol. 7 at 99–101. Because the tax is normally on *net* income, states typically omit (deduct) revenue that was spent to generate taxable income (e.g., costs of labor, advertising, utilities, legal fees, etc.). But they include as part of taxable income revenue that was spent for things other than generating taxable income (e.g., money spent purchasing tax-exempt bonds). *Id.*

To simplify things and promote uniformity, most states with corporate income taxes, including Indiana, use as their starting point the tax base for the federal income tax return—federal adjusted gross income (which essentially amounts to net income). *Id.* at 99–100; Jerome R. Hellerstein, Walter Hellerstein & Andrew D. Appleby, *State Taxation* ¶ 7.02 (3d. ed. March 2026 update); I.C. § 6-3-1-3.5(b) (defining taxable income "as defined in Section 63 of the Internal Revenue Code" with specific state adjustments). States then make statutory adjustments, like adding back

some federally approved deductions (e.g., charitable contributions[1]), to determine the state adjusted gross income. App. Vol. 7 at 99–100; Hellerstein et al., *supra*, ¶ 7.02. So *federal* adjusted gross income (federal taxable income) and *state* adjusted gross income (state taxable income) are related, but different.

This process of determining the state tax base is akin to assessing the size of a taxable pie. App. Vol. 7 at 96–97.

## B.   State Apportionment (a State's "Slice of the Pie")

The second step is to determine the portion of the tax base attributable to income from the taxing state—that state's "slice of the pie"—which is the only portion that state can tax. *Id.* at 97; Hellerstein & Hellerstein, *supra*, at 8-71. A state government may tax only income sourced to that state because the Fourteenth Amendment's Due Process Clause "demands that there exist some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax, as well as a rational relationship between the tax and the values connected with the taxing State." *MeadWestvaco Corp. ex rel. Mead Corp. v. Ill. Dep't of Revenue*, 553 U.S. 16, 24 (2008) (quotations omitted). And the U.S. Constitution's Commerce Clause "forbids the States to levy . . . unfairly apportioned taxation." *Id.*

So after determining the state adjusted gross income, the taxing state applies a formula to determine how much taxable income is sourced to that state. App. Vol. 7 at 97–99. Most states, including Indiana, use a "single-factor sales formula" to apportion their net income tax base. I.C. § 6-3-2-2(e); App. Vol. 7 at 99. Under that formula, the state calculates the taxpayer's in-state sales as a fraction of total worldwide sales and

---

[1] *See, e.g.*, I.C. § 6-3-1-3.5(b)(2) ("Add an amount equal to any deduction or deductions allowed or allowable pursuant to Section 170 of the Internal Revenue Code (concerning charitable contributions).").

multiplies that fraction by the adjusted gross income. I.C. § 6-3-2-2(b)(5); App. Vol. 7 at 98–99.

Consider a corporation with $10,000 worth of sales—$2,000 of sales in Indiana, and $8,000 in Illinois—producing a total of $1,000 in state adjusted gross income after deducting ordinary business expenses (and no deduction for state income taxes). *See* App. Vol. 7 at 102. Indiana's apportionment percentage would be 20% ($2,000 in Indiana sales ÷ $10,000 in total sales), yielding apportioned net income of $200 (20% apportionment x $1,000 adjusted gross income). If Indiana applied a 10% tax rate, its net income tax would be $20 (10% x $200). If Illinois used the same formula and rate, its apportionment percentage would be 80% ($8,000 in Illinois sales ÷ $10,000 in total sales); its apportioned net income would be $800 ($8,000 ÷ $10,000); and its tax would be $80 (10% x $800).

The taxation, with each state taking its tax bite out of only its own slice, breaks down like this:



There is a potential glitch lurking, though, which is the core of this case. Even when a state uses a proper apportionment formula for calculating the state's taxable slice, it remains critical to first properly calculate the size of the pie. Underestimating the pie will lead to under-taxation when

the state applies its formula—if the pie is too small, the state's slice will be too small and the resulting tax too little. Overestimating the pie will lead to over-taxation when the state applies its formula—if the pie is too big, the state's slice will be too big and the resulting tax too much.

To avoid underestimating the size of the pie and collecting too little tax, states that levy a net income tax usually require corporations to add back to their adjusted gross income the federal deduction for apportioned income taxes they pay to other states, which we discuss next.

## C. Adding Back Deductions for Other States' Apportioned Income Taxes

When designing their own taxes, states start with federal adjusted gross income because it simplifies things, but stopping there would create a problem. The federal government allows deductions for state income taxes because those taxes are costs of generating federal taxable income. *Id.* at 101. In our example above, the corporation paid $20 in taxes to Indiana and $80 in taxes to Illinois to generate $1,000 in federal taxable income, so the federal government lets the taxpayer deduct that $100, reducing federal adjusted gross income from $1,000 to $900. Key here is recognizing that federal adjusted gross income reflects a taxpayer's income *after* deducting the states' apportioned income taxes.

But an apportioned tax, such as a state net income tax, that a corporation pays to one state cannot be a cost of generating taxable income for another state—that's the whole point of apportionment. *Id.* at 101–103. The net income tax our hypothetical corporation paid to Illinois was a cost of generating federal and Illinois taxable income, but not Indiana taxable income; Illinois could tax only income sourced to Illinois, from which Indiana can't take a share. *Id.*

If Indiana deducted the Illinois net income tax payment even though that tax didn't generate any income that Indiana would be apportioning and then taxing, Indiana would be applying its apportionment formula to an artificially deflated base. *Id.* Considered another way, Indiana would allow the taxable income to be apportioned twice—first when paid to

Illinois, and then again after Indiana applied its apportionment formula to a smaller pie (federal adjusted gross income) that deducted the Illinois tax payment. Pomp, *supra*, at 423.

The problem is that state adjusted gross income should be calculated *before* deducting the states' apportioned income taxes, unlike federal adjusted gross income which is calculated *after* that deduction. To fix this, Indiana takes the typical approach. In the example, Indiana adds back the federal deduction for the income tax the corporation paid to Illinois *and then* calculates its slice of the tax pie with its apportionment formula. I.C. § 6-3-1-3.5(b)(3); Hellerstein et al., *supra*, ¶ 7.12 ("Most states deny corporations deductions for state taxes on, or measured by, net income, whether imposed by the taxing state or its local subdivisions, by other states or their subdivisions, by the federal government, or by foreign countries."). That way, Indiana is apportioning its fair share before any states have taken their tax bite out of the pie.

Continuing with our illustration, without the add-back, the Indiana tax base would be $920—the $1,000 adjusted gross income minus the $80 Illinois tax. (There would be no deduction for the $20 Indiana tax because states generally don't allow a deduction for their own income taxes.) Applying Indiana's 20% apportionment to this tax base yields $184 (20% of $920), not the $200 in sales actually attributable to Indiana. And at a 10% rate, Indiana would collect only $18.40 instead of $20. The Illinois deduction—which had nothing to do with generating Indiana taxable income—would artificially shrink Indiana's tax base.

Beyond just diminishing the State's coffers, this treats corporations that generate interstate revenue more favorably than corporations that generate revenue only intrastate. *See Ross Fogg Fuel Oil Co. v. Dir., Div. of Tax'n*, 22 N.J. Tax 372, 377 (2005) ("If the deduction of the taxes of other jurisdictions is allowed, corporations which do business in several states pay a lower effective rate of tax on their New Jersey activities than do corporations which only do business in New Jersey."). A competitor with $200 in Indiana sales but no sales elsewhere would owe Indiana $20, while the multi-state corporation would owe only $18.40, even though both had identical Indiana-sourced income. By requiring corporations to add back

the apportioned taxes they paid to other states, states ensure the taxable income is apportioned only once rather than twice. That prevents disparate treatment and ensures states tax their proper share of income sourced to them.

### D. Unapportioned Costs (Including Taxes)

This logic applies only to adding back *apportioned* taxes—taxes states levy on only their share of income after applying an apportionment formula. Because states levy those taxes on only their share, out-of-state apportioned income taxes cannot be costs to generate in-state income.

But *un*apportioned taxes—like sales taxes or utilities taxes, which cover only intrastate transactions and are not subject to an apportionment formula—are different. App. Vol. 7 at 103. Those are the same as any other unapportioned costs for generating taxable income, such as labor or utilities. *Id.* Those costs, regardless of the state where they were incurred, contributed to taxable income across all taxing states—they were costs of producing income that went into the pie from which all the income-generating states will take their slice and so should be deductible. *Id.* Adding those costs back would artificially inflate the tax base and the resulting tax. *Id.* at 103–04. This is likely why, to our knowledge, no other state does so. *See id.* at 104–05.

Returning to our hypothetical, the corporation spent $9,000 to produce its $1,000 of net income. Assume half those costs were labor and half were unapportioned taxes, like sales or utilities taxes. All those costs produced the $1,000 of taxable net income to which *both* Indiana and Illinois will apply their apportionment formulas; both states will get a percentage of the income those costs produced.

But if those states instead added the costs back in, the tax base would become $10,000 even though the corporation had only $1,000 in profit. Indiana's 20% slice would become $2,000 instead of $200, and its 10% tax rate would yield a $200 tax rather than $20; Illinois' 80% slice would become $8,000, yielding an $800 tax. That would artificially inflate the taxes by a multiple of ten, and a ten percent income tax would consume

all the profit. Even a proper apportionment formula is little defense, as it does not stop the gross distortion of the tax base to which the formula applies.

It also makes no difference that these unapportioned costs—labor or taxes—were incurred entirely inside one state, either Indiana or Illinois. The costs still contributed to the entire taxable pie out of which both states cut a slice and took their tax "bite," so the unapportioned costs should remain deducted no matter where they were incurred.

## II.  Penn's Tax Protest

Penn is a Pennsylvania corporation with subsidiaries operating casinos and other gambling operations in seventeen states during the relevant tax years. One of those subsidiaries is Indiana Gaming Company, LLC, which operates the Hollywood Casino in Lawrenceburg.

On Penn's federal tax returns for tax years 2015, 2016, and 2017, it deducted roughly $9.2 million for net income taxes it paid to other states. That was under I.R.C. § 164(a)(3), which permits the deduction of state income taxes. Penn also deducted roughly $2 billion in various unapportioned wagering excise taxes it paid to other states. That was under I.R.C. § 162(a), which permits the deduction of "ordinary and necessary expenses."

On Penn's Indiana tax returns for those years, Penn added back, under Indiana Code section 6-3-1-3.5(b)(3), the $9.2 million deduction for state-level apportioned net income taxes. But Penn did not add back the $2 billion in state-level unapportioned wagering taxes.

In February 2021, the Department audited Penn for those years and determined that the statute also required Penn to add back the wagering taxes it paid to Illinois, Maine, Massachusetts, Mississippi, Missouri, Nevada, New Mexico, Ohio, Pennsylvania, and West Virginia. Those taxes were:

| | | |
|---|---|---|
| Illinois | Privilege tax based on receipts from gaming transactions minus winnings | $82,216,286 (2015) $73,306,187 (2016) $26,349,650 (2017) |
| Maine | Tax on slot machine or table game transactions minus winnings | $22,605,653 (2015) $22,467,309 (2016) $0 (2017) |
| Massachusetts | Daily remitted transactions tax on gross gaming revenues | $34,775,399 (2015) $63,224,720 (2016) $81,144,483 (2017) |
| Mississippi | License fee on gross gaming revenue | $12,852,846 (2015) $12,014,874 (2016) $5,265,439 (2017) |
| Missouri | Tax on gaming receipts minus winnings | $78,589,061 (2015) $82,288,823 (2016) $49,831,573 (2017) |
| Nevada | Monthly license fee on cash from gaming transactions minus cash paid out | $6,215,194 (2015) $6,471,542 (2016) $6,610,971 (2017) |
| New Mexico | Excise tax on cash received from gaming transactions minus amount paid out | $22,505,447 (2015) $19,211,466 (2016) $19,913,377 (2017) |
| Ohio | Tax on gross casino revenue | $194,941,127 (2015) $197,506,669 (2016) $232,884,133 (2017) |
| Pennsylvania | Daily slot machine tax and table games tax | $132,365,552 (2015) $128,417,910 (2016) $125,759,436 (2017) |
| West Virginia | Privilege tax on adjusted gross receipts from gaming transactions minus winnings paid | $65,300,267 (2015) $187,785,889 (2016) $0 (2017) |

The Department doesn't dispute that the $9.2 million in net income taxes Penn added back were apportioned taxes and the roughly $2 billion Penn didn't add back were unapportioned taxes. After adding back those wagering taxes, the Department determined Penn owed (before penalties

and interest) an additional $8,752,677 for those three years—$2,790,259 for 2015; $3,191,478 for 2016; and $2,770,940 for 2017.

Penn protested the Department's assessment requiring that Penn add back the wagering taxes. Penn argued the statute only required it to add back apportioned state net income taxes, not unapportioned wagering excise taxes. It also argued that requiring it to add back the wagering taxes would violate the Commerce Clause, the Equal Protection Clause, and the Due Process Clause of the U.S. Constitution as well as similar provisions of the Indiana Constitution.

The Department sustained Penn's protest of penalties but not Penn's protest of additional taxes and interest, so Penn appealed to the Tax Court, where the parties cross-moved for summary judgment. The Tax Court entered summary judgment for the Department, concluding that this Court's precedent required Penn to add back the wagering taxes consistent with both the state and federal constitutions. *PENN Ent., Inc. v. Ind. Dep't of State Revenue*, 230 N.E.3d 385, 395, 400 (Ind. T.C. 2024). Penn then filed a Petition for Review in this Court, which we granted. Ind. Appellate Rule 63.

## Standard of Review

"Summary judgment is appropriate only when the designated evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Merch. Warehouse Co. v. Ind. Dep't of State Revenue*, 87 N.E.3d 12, 15–16 (Ind. 2017). Because that presents a legal question, we generally review summary judgment rulings de novo. *Korakis v. Mem'l Hosp. of S. Bend*, 225 N.E.3d 760, 764 (Ind. 2024).

## Discussion and Decision

Penn must add back "any deduction or deductions allowed or allowable pursuant to Section 63 of the Internal Revenue Code for **taxes based on or measured by income** and levied at the state level by any state of the United States." I.C. § 6-3-1-3.5(b)(3) (emphasis added). The parties

agree all the disputed taxes are deductible under Section 63, but they disagree whether the taxes are "based on or measured by income" because they disagree about what that phrase means. *Id.*

Penn and its supporting amici argue the statute's reference to "income" conveys several limits. In their view, the statute covers only *net* income taxes, not *gross* income taxes; only *income* taxes, not *excise* taxes; and only *apportioned* taxes, not *un*apportioned taxes. The Department disagrees. In its view, the phrase "*measured by* income" conveys that the statute covers more than traditional net income taxes, and the test is whether the tax is calculated with reference to revenue. With that understanding, the Department argues the statute covers gross income taxes, excise taxes, and unapportioned taxes, so long as those taxes are calculated with some reference to revenue.

Both sides overshoot. We conclude the phrase refers to direct income taxes (taxes "based on" income) and their functional equivalents (taxes "measured by income"), and both those categories cover only taxes subject to the apportionment requirements of the federal constitution. Contrary to Penn's view, our precedent holds that the phrase covers gross income taxes as well as net income taxes. And the phrase also covers *some* excise taxes—those that are calculated similarly to direct income taxes, including that they are apportioned. But contrary to the Department's view, this statute does not cover unapportioned excise taxes. In other words, this statutory tool to prevent *double* apportionment does not apply to taxes that were never apportioned a first time. Because none of the excise taxes at issue are apportioned, Penn did not need to add them back.

We interpret the statute this way for three reasons. First, the statute is a standard add-back provision for calculating the State's proportionate share of income taxes, and our interpretation reflects the conventional understanding among the states. Second, the Department does not identify any good reason, consistent with the statute's purpose, for adding back the unapportioned wagering taxes, and we agree with Penn that adding them back would exaggerate the tax base. Third, deducting the unapportioned wagering taxes is consistent with our precedent.

We discuss each of these reasons in turn.

# I. Indiana's statute is a standard income tax add-back provision.

Indiana's statute is a standard add-back provision that requires adding back apportioned income taxes. The statute covers both gross and net income taxes, and it covers excise taxes that are the functional equivalent of income taxes. One reason for this is because those kinds of excise taxes are subject to the same federal constitutional apportionment requirements. But the statute does not cover unapportioned excise taxes, which describes all the wagering taxes at issue here.

## A. The statute covers direct income taxes and their functional equivalents.

Our legislature adopted a conventional tax policy through conventional tax language.

The policy is the one we explained above. *Supra*, at 7–9. In short, for a sensible apportionment, a taxing state needs to calculate its share *before* other states' apportioned taxes have been deducted. Otherwise, there is a double apportionment, with the second apportionment dividing an artificially deflated tax base. To avoid this, states typically require taxpayers to add back the federal deduction for apportioned income taxes they paid to other states.

There is no dispute that almost all states with a corporate income tax have adopted this policy. *See* Hellerstein et al., *supra*, ¶ 7.12[1]. And they adopt this policy through varied references to other states' income taxes. *Compare* App. Vol. 7 at 121–22 (collecting statutes); *see generally* 2B Norman Singer & Shambie Singer, *Sutherland Statutory Construction* § 52:3 (7th ed.) ("Legislation in other states and jurisdictions may help guide the interpretation of a doubtful statute which pertains to the same subject matter, persons, things, or relations."). Some references are direct, instructing taxpayers to add back other states' "income taxes." *E.g.*, Ala. Code § 40-18-34(a). Other references are indirect, instructing taxpayers to add back the "deduction[] under section 164(a)(3)" of the Internal Revenue Code, which is the federal deduction for state income taxes. *E.g.*,

Haw. Rev. Stat. § 235-2.4(j)(2); I.R.C. § 164(a)(3). And still others refer to adding back "taxes based on or measured by net income." *E.g.*, Alaska Stat. § 43.20.031(c).

Whichever variation states choose, these statutes all refer to adding back corporate income taxes. Forty-four states levy a corporate income tax, and those taxes fall into two categories—direct income taxes and excise taxes that function like income taxes. *See* Abir Mandal, *State Corporate Income Tax Rates and Brackets, 2026*, Tax Foundation (Jan. 5, 2026), https://taxfoundation.org/data/all/state/state-corporate-income-tax-rates-brackets/ [https://perma.cc/9B6U-EW7Z] (cataloging states with corporate income taxes); App. Vol. 7 at 121 (same); 14A *Fletcher Cyc. Corp.* § 6890 (Sep. 2025 update) (discussing the two categories of corporate income taxes). By referring to taxes "based on or measured by income," states like Indiana more clearly include both categories than if they simply referred to "income" or "I.R.C. § 164(a)(3)."

The first category covers taxes "based on" income. I.C. § 6-3-1-3.5(b)(3). Those are direct income taxes, which are taxes on "income derived from or attributable to the state." Hellerstein et al., *supra*, ¶ 7.01. For a time, many states interpreted their state constitutions as forbidding direct corporate income taxes, which led to the second category. H.R. Rep. No. 88-1480 at 101 (1964).

The second category covers taxes "measured by income." I.C. § 6-3-1-3.5(b)(3). States that could not directly tax income instead adopted "excise taxes on the privilege of doing, or the license to do, business in the state or simply on doing business, owning property, or engaging in other activities within the state." Hellerstein et al., *supra*, ¶ 7.01. Those taxes can come in the form of a "franchise tax," "privilege tax," or a "business and occupation tax." *See* 14A *Fletcher Cyc. Corp.* § 6893 (Sep. 2025 update).[2] And the taxes are often calculated from the corporation's income. *See id.* In

---

[2] *See also id.* § 6890.50; *Tax*, Black's Law Dictionary (12th ed. 2024) (defining "privilege tax" as "[a] tax on the privilege of carrying on a business or occupation for which a license or franchise is required").

other words, the corporate tax is "measured by income" rather than "based on" income. I.C. § 6-3-1-3.5(b)(3).[3] States borrowed this idea from the federal government, which imposed a similar tax before adopting a corporate net income tax. *See* H.R. Rep. No. 88-1480 at 101 ("[S]everal States followed the example of the 1909 [federal] act and instituted levies on the privilege of incorporation or on the privilege of doing business in corporate form within the State, to be measured by the corporation's net income.").[4] Although these taxes were crafted to avoid state constitutional limits on direct income taxes, they are the functional equivalent of direct income taxes for purposes of apportionment and state add-back statutes, so they are still generally referred to as "income taxes." *See generally* Hellerstein et al., *supra*, ¶ 7.01 (explaining that "the distinction between franchise taxes [measured by income] and direct net income taxes is largely of historical significance," so the taxes "are described simply, and interchangeably, as corporate income taxes"); *see also Miles v. Dep't of Treasury*, 199 N.E. 372, 377 (Ind. 1935) (explaining there is only "a 'theoretical distinction' or a 'very slight' difference between a net income

---

[3] *See also* 71 Am. Jur. 2d *State and Local Taxation* § 166 ("While a franchise or privilege tax on domestic corporations is a tax, not on property or income, but on the value of the privilege to transact business in the state, it can be measured on net income, or gross receipts." (footnotes omitted)); 71 Am. Jur. 2d *State and Local Taxation* § 338 ("Income taxes are based on monies made while franchise taxes stem from the notion that a company should pay, in advance, for the privilege of operating its business in the state. A franchise tax may be measured by a taxpayer's income without being construed as an income tax." (footnotes omitted)).

[4] As the Report explains in more detail:

> One result of the constitutional barriers to direct corporate income taxes was that the States turned to franchise or privilege taxes measured by net income, which were considered to be "indirect taxes." In doing so they were following the lead of the United States Congress which in 1909 imposed an "excise" tax on corporations measured by net income. This tax, which was held constitutional by the Supreme Court as an indirect tax, was subsequently supplanted by the Federal direct income tax structure. However, several States followed the example of the 1909 act and instituted levies on the privilege of incorporation or on the privilege of doing business in corporate form within the State, to be measured by the corporation's net income. Connecticut, for example, in 1915 levied such a tax measured by corporate income derived from sources within the State.

H.R. Rep. No. 88-1408 at 101 (footnote omitted).

tax and an excise measured by income").[5]

This has long been the understanding. Shortly after Indiana enacted the add-back statute in its current form, the Department's 1968 audit manual explained that, with one exception, "the only taxes which would be added back were state income taxes." App. Vol. 5 at 180–81.[6] The "[o]ne exception would be a franchise tax that is based on or measured by income and levied at the state level." *Id.* at 181. Just as we explain today, the Department explained then that the exception was because that "type of tax is usually found as a substitute for a state income tax where a state's constitution forbids a direct income tax." *Id.* Even today, the Department's audit manual still aptly refers to the statutory provision as "the state income tax addback to federal taxable income" even though it also covers excise taxes that are the functional equivalent of income taxes. App. Vol. 3 at 146, 147.[7] And the Department's director of Audit Operations Support testified in her Trial Rule 30(b)(6) deposition for this case that "any state and local income tax deducted on the federal return is what's required to be added back." App. Vol. 6 at 28–29.

As we explain next, what matters for Indiana's corporate tax and its

---

[5] *See also Vickers v. Dep't of Revenue*, 771 P.2d 268, 270 n.3 (Or. 1989) (explaining that Oregon's "corporate excise tax" is "essentially one on corporate income"); 14A *Fletcher Cyc. Corp.* § 6908 (Sep. 2025 update) (explaining that "[t]he state of Washington imposes a broad-based 'business and occupations tax' on the gross receipts of all corporations and other persons for the privilege of doing business in the state," but "does not impose an income tax on corporations or individuals, so the gross receipts tax serves the purpose served by income taxes in other states").

[6] The Manual also said "local property taxes" were added back, *id.* at 181, but that was later repealed, 1999 Ind. Acts 2121.

[7] *See also* Charles F. Bonser et al., *Business Taxation in Indiana, Report of the Commission on State Tax and Financing Policy* 29 (1966) ("An amendment to the Act of 1965 changed the law to require only the 'add-back' of state income taxes and local property taxes." (reproduced at App. Vol. 5 at 111)); *id.* at 54 ("As noted earlier, the tax add back feature was revised in 1965 to require only the add-back of state income taxes and local property taxes."); Ind. Dep't of Revenue, *The Indiana Adjusted Gross Income Tax, A Guide for Auditors* 7–8 (1968 ed.) ("The 1965 general assembly clarified the 1963 wording of the law by saying that, in effect, the only taxes which would be added back were state income taxes and local property taxes." (reproduced at App. Vol. 5 at 180–81)).

add-back provision is whether another state's tax functions as an income tax, not whether it is a *gross* or *net* income tax.

## B. Whether the tax is a gross income tax or a net income tax is not dispositive.

One of Penn's arguments is that the statute requires adding back only net income taxes, not gross income taxes, so Penn didn't need to add back any of the disputed taxes because none of them are limited to net income. Some states' statutes make that distinction expressly, with some saying taxpayers must add back only "taxes based on or measured by net income," *see, e.g.*, Alaska Stat. Ann. § 43.20.031(c), and others saying taxpayers must add back both net income taxes and gross income taxes, *see, e.g.*, Ky. Rev. Stat. Ann. § 141.039(2)(c)(1) (adding back any "tax which is computed . . . by reference to gross or net income").

Our Court previously rejected the argument that the statute is limited to net income taxes, and Penn acknowledges we do not need to revisit that precedent here. *Consolidation Coal Co. v. Indiana Dep't of State Revenue*, 583 N.E.2d 1199, 1200, 1201 (Ind. 1991) (rejecting the argument that "income" is "equivalent to gross receipts less the costs of goods sold" and concluding that the phrase "based on or measured by income" "suggests a broader inquiry"). We only overturn our precedent when necessary, and we can resolve this appeal on other grounds, so we decline to reconsider our prior analysis. *See State v. Timbs*, 169 N.E.3d 361, 369 (Ind. 2021) (explaining that we only overturn precedent "when there are urgent reasons and a clear manifestation of error" (quotations omitted)).

That takes us to the parties' next point of disagreement, which is whether the statute covers "excise" taxes.

## C. Apportioned excise taxes must be added back, but not unapportioned excise taxes.

Penn argues that the statute covers "income" taxes, not "excise" taxes. An "income tax is in effect a tax upon earnings." *Tax*, Black's Law Dictionary (12th ed. 2024) (quoting Henry Campbell Black, *A Treatise on*

*the Law of Income Taxation Under Federal and State Laws*, § 1 (1913)). An "excise tax" is "[a] tax imposed on the manufacture, sale, or use of goods (such as a cigarette tax), or on an occupation or activity (such as a license tax or an attorney occupation fee)." *Tax*, Black's Law Dictionary (12th ed. 2024).

The Department responds that the label doesn't matter. To the Department, what matters is not the *subject* of the tax but its *measure*, and the Department concludes the statute covers any tax that is measured by reference to revenue. We find the answer somewhere between these two positions: The statute covers excise taxes that are the functional equivalent of income taxes (apportioned excise taxes), but not excise taxes that aren't (unapportioned excise taxes).

The problem with Penn's focus on the label of "income" or "excise" taxes is that, depending on the context and level of generality, income taxes can be a form of excise tax. *See, e.g.*, 14A *Fletcher Cyc. Corp.* § 6904.50 ("Since income taxes generally are held to be excise taxes, they are not governed by constitutional provisions with respect to uniformity, valuation, and the like as apply to property taxes."). And sometimes the taxes are functionally equivalent even though there are reasons to keep the labels distinct. *See Cal-Roof Wholesale, Inc. v. State Tax Comm'n*, 410 P.2d 233, 238 (Or. 1966) ("In tax parlance a corporation tax 'measured by income' is an excise tax; a tax 'based upon income' is an income tax."); *see also Ind. Dep't of State Revenue v. Fort Wayne Nat'l Corp.*, 649 N.E.2d 109, 111 n.4 (Ind. 1995) ("Throughout the case law, the term 'excise tax' is a collective term which denotes a number of various indirect taxes, including franchise and privilege taxes.").

As we explained in the previous section, in *this* context—add-back statutes applied before apportioning corporate net income—direct income taxes and excise taxes that are the functional equivalent of direct income taxes "are described simply, and interchangeably, as corporate income taxes." Hellerstein et al., *supra*, ¶ 7.01; *Miles v. Dep't of Treasury*, 199 N.E. 372, 377 (Ind. 1935) ("While there may be a 'theoretical distinction' or a 'very slight' difference between a net income tax and an excise measured by income, it is difficult to find any practical distinction to be made

between a gross income tax and an ordinary excise tax. It is a tax 'on the recipient of the income, the tax being upon the right or ability to produce, create, receive, and enjoy, and not upon specific property.'"). This too is reflected in the statutory language some states choose for their add-back provisions. *See* Miss. Code Ann. § 27-7-17(1)(c) (adding back "state and federal income taxes [and] excise taxes based on or measured by net income"); S.C. Code Ann. § 12-6-1130(2) (adding back "income taxes, state and local franchise taxes measured by net income, other income taxes, or taxes measured with respect to net income"); Va. Code Ann. § 58.1-402(B)(4) (adding back "net income taxes and other taxes, including franchise and excise taxes, which are based on, measured by, or computed with reference to net income").

What matters most is whether the excise tax is subject to the federal constitutional requirement that states apportion the revenue they are taxing. That distinction is the most important one because the statute's purpose is to prevent a double apportionment. Privilege taxes, franchise taxes, and business-and-occupation taxes measured by income are all excise taxes, but they usually capture income from interstate commerce too, so they must be apportioned. *See, e.g.*, *Glatfelter Pulpwood Co. v. Commonwealth*, 61 A.3d 993, 998 (Pa. 2013) ("Pennsylvania's corporate income tax is an excise tax on the privilege of earning income and, therefore, under the Commerce Clause of the United States Constitution, Pennsylvania may subject to taxation only that part of corporate income reasonably related to the privilege exercised in this Commonwealth."); *Miss. State Tax Comm'n v. Murphy Oil USA, Inc.*, 933 So. 2d 285, 294 (Miss. 2006) (applying apportionment requirements to a franchise tax). Because these excise taxes are the functional equivalent of direct income taxes, including that the excise taxes are subject to apportionment requirements, the statute requires adding the taxes back to avoid a double apportionment.

Other excise taxes, like fuel and cigarette taxes, cover only intrastate transactions. And because the transactions are not in interstate commerce, they are not subject to apportionment requirements. *See Philadelphia Eagles Football Club, Inc. v. City of Philadelphia*, 823 A.2d 108, 130 n.37 (Pa. 2003) (collecting authority for the proposition that intrastate transactions are not

subject to apportionment requirements). This is the category of excise tax covering all the wagering taxes at issue here—each tax covers only intrastate transactions, so the taxing states do not apply an apportionment formula to the revenue.

## D. The wagering taxes here did not need to be added back.

The Department acknowledges all the taxes at issue are unapportioned excise taxes. The gambling transactions Illinois taxes, for example, can occur only in Illinois, so Illinois doesn't need to apply an apportionment formula to limit its wagering tax. And because Illinois never applied an apportionment formula to those transactions in the first place, there is no double apportionment risk to avoid by adding the taxes back when calculating Indiana income.

While Illinois is taxing only intrastate transactions, those transactions generate revenue to which both Illinois and Indiana ultimately apply their apportionment formulas when calculating their apportioned corporate net income taxes. Since Indiana imposes a net income tax on corporations, ordinary business expenses—expenses necessary to generate income Indiana apportions and then taxes—should remain deducted. All the wagering excise taxes at issue here are ordinary business expenses, so they should also remain deducted.

There is yet another reason the disputed, out-of-state taxes are not the functional equivalent of income taxes and, thus, should not be added back to Penn's taxable income in Indiana. If a proposed tax classification already exists elsewhere in the state's taxation scheme, this fact supports the view that a different tax should carry a different classification. Hellerstein et al., *supra*, ¶ 6.03[3][a]. Here, all ten states that collected the disputed taxes from Penn during the relevant tax years also "imposed state income taxes" for those years. Petitioner's Notice of Additional Authorities at 1 (collecting statutes). As Hellerstein puts it, "Although it is conceivable that a state would adopt a second levy . . . that in relevant structural aspects was similar to the pre-existing" tax, common sense

instructs that this result is "doubt[ful]." Hellerstein et al., *supra*, ¶ 6.03[3][a].

West Virginia provides an example. Through the "West Virginia Corporation Net Income Tax Act," W. Va. Code Ann. § 11-24-2, that state imposes a "combined system of income tax reporting for corporations" doing business within its borders, *id.* § 11-24-1. Penn paid this tax and willingly added it back to its Indiana tax base because it is obviously "based on or measured by income." I.C. § 6-3-1-3.5(b)(3). But to Penn's surprise, the Department also determined that West Virginia imposed another "income" tax: the privilege tax for operating "table games" previously discussed, W. Va. Code Ann. § 29-22C-26, because that tax is measured using "adjusted gross receipts," *id.* The fact that West Virginia collects a separate, comprehensive corporate income tax shows that its table games tax is the sort of excise tax not subject to Indiana's add-back provision. *See Consolidation Coal Co.*, 583 N.E.2d at 1202.

Confirming this view, Penn designated uncontroverted evidence that no other state requires it to add back the wagering taxes at issue, and its state-tax-law expert confirms that no state requires adding back these unapportioned taxes. The Department isn't sure whether other states require adding the taxes back, but it says that is irrelevant because Indiana can adopt a tax policy different from every other state. Of course, the Department is correct that Indiana can chart its own path inside constitutional boundaries, but there is no indication Indiana chose to take an idiosyncratic approach by adopting standard statutory language on a matter of standard tax policy.

At bottom, because an add-back statute is a tool for accurate apportionment, it is generally understood as covering two categories of apportioned taxes only: (1) state income taxes and (2) excise taxes that substitute for or are the functional equivalent of income taxes. The disputed wagering taxes fall into neither category and therefore did not need to be added back. The add-back statute undoes other states' prior apportionment for their income taxes, preventing artificial deflation of the tax base. Because the wagering excise taxes were never apportioned, there is no apportionment to undo.

The Department does not propose any good reason as a matter of tax policy to add these unapportioned taxes back when calculating Indiana's apportioned taxes, which we discuss next.

## II. The Department does not identify any good reason for adding back the unapportioned excise taxes.

The Department argues that (1) adding back the unapportioned excise taxes Penn paid to other states is necessary to accurately capture all of Penn's Indiana-sourced net income, and (2) Penn's concern that adding back those taxes artificially inflates the tax base is misplaced because the apportionment formula stops that from happening. Both arguments fail.

### A. Adding back other states' unapportioned excise taxes does not produce a more accurate apportionment for Indiana.

The only reason the Department proposes for adding back the unapportioned excise taxes Penn paid to other states is that "a corporation having its most profitable casino in Indiana might use its Indiana income to pay taxes owed in other states," so that casino should not "be allowed to write off a portion of its income, even income generated in Indiana, when that income was used to pay taxes to other states." Resp. to Pet. for Rev. at 9.

The Department's argument has things backwards. Penn is not trying to write off income generated in Indiana. All the taxes Penn deducted were wagering taxes exclusively on intrastate transactions in other states. Those taxes were an expense Penn paid to generate revenue in other states, and Indiana now includes that revenue in the nationwide tax pie from which it seeks to apportion and then tax a slice. That is why Penn deducted the expenses from its federal taxable income as ordinary business expenses under I.R.C. § 162 rather than as state income taxes under I.R.C. § 164. As with any other expense to generate income for the

tax base subject to apportionment, the expense of wagering taxes should be deducted.

Those wagering excise taxes contrast with the income taxes Penn paid to other states. Unlike the wagering excise taxes, the income taxes were subject to an apportionment formula to ensure those states were taxing only income sourced to the taxing state. Thus, those apportioned income taxes could not be costs of generating income taxable in Indiana—again, that's the whole point of apportionment. For that reason, the income taxes are not deductible in Indiana, and Penn appropriately added them back so that the related revenue would be apportioned only once rather than twice.

To be sure, as the Department says, it is not our place to judge the soundness of the tax policy the legislature adopted. *See Estabrook v. Mazak Corp.*, 140 N.E.3d 830, 834 (Ind. 2020). But we do have to discern the most reasonable interpretation of the words the legislature chose, and we choose the conventional understanding of those words that are broadly adopted among the states for uniform reasons the Department acknowledges are sound tax policy. *See Andrew Nemeth Props., LLC v. Panzica*, 271 N.E.3d 1100, 1110 (Ind. 2025) ("We think it is likely that the close similarity between Indiana's statute and other states' statutes reflects that our legislature made the same policy choice as those other states . . . .").

As we discuss next, this conventional understanding also avoids exaggerating the tax base.

## B. The apportionment formula does not protect against the Department exaggerating the tax base by adding back unapportioned excise taxes.

Penn's core critique is that the Department is taking a statutory tool for preventing an artificially deflated tax base and misusing it to artificially inflate the tax base. The Department responds that the State's apportionment formula prevents that sort of distortion. Penn has the better argument.

Consider two states with corporate net income taxes and a corporation with net income of $2,000, half from State A and half from State B. State B should tax only its half—$1,000. Now suppose one of the expenses the corporation deducted was a $100 unapportioned excise tax to State A. For a corporate net income tax like Indiana's, the excise tax paid to State A is properly deducted in State B because that was a cost of generating the $2,000 taxable income that State B apportioned ($1,000 for its half) and then taxed. But if State B required the corporation to add back the excise tax, State B would then apportion its half of $2,100, thus increasing its taxable portion by $50 to $1,050. In essence, by treating an ordinary expense as profit, State B taxes gross revenue rather than just net income, and it artificially distorts the tax base so that it can tax more than its share without having to change its apportionment percentage.

That is the effect of what the Department proposes here, but on a much larger scale. For example, by requiring Penn to add back more than $800 million in other states' unapportioned wagering taxes in 2016, the Department's assessment multiplies the income apportioned to Indiana by sixteen—adding almost $50 million to the tax base, growing it from $3.1 million to $50.1 million—without changing the apportionment percentage. And by distorting the tax base, the Department's assessment allows Indiana to tax roughly *twice* the amount of Penn's *total* worldwide profit. This also multiplies Penn's tax burden to Indiana by about sixteen, from $204,218.87 to $3,256,609.92.

|  | Adding Back State Net Income Taxes But Not Wagering Taxes | Adding Back State Net Income Taxes **and** Wagering Taxes |
|---|---|---|
| Federal AGI | $26,169,552 | $26,169,552 |
| State AGI | $52,803,845[8] | $842,045,228 |
| Apportionment % | 5.95% | 5.95% |
| IN Apportioned Income | $3,141,828.78 | $50,101,691.10 |
| Corporate Income Tax Rate | 6.50%[9] | 6.50% |
| Tax Owed to Indiana | $204,218.87 | $3,256,609.92 |

App. Vol. 4 at 15–16; App. Vol. 5 at 91.

Returning to the pie metaphor, by artificially expanding the tax base, the Department dramatically grows Indiana's slice of the pie without changing the percentage Indiana is taking. So much so that the $3.2 million tax "bite" Indiana taxes from the inflated base exceeds all of the State's $3.1 million "slice" from a properly calculated base.



[8] Penn reported $22,533,452 in federal adjusted gross income, but the State's audit calculated the amount as $3,636,100 higher, for a total of $26,169,552. Adding back the undisputed sums for other states' net income taxes yields the Indiana adjusted gross income of $52,803,845.

[9] The rate was 7% from July 1, 2014 to June 30, 2015; 6.5% from July 1, 2015 to June 30, 2016; 6.25% from July 1, 2016 to June 30, 2017; and 6% from July 1, 2017 to June 30, 2018. I.C. § 6-3-2-1(c)(4)–(7). For simplicity, we use 6.5% in this illustration.

Under the Department's assessment, Penn would pay 68% of its 2016 corporate net income taxes to Indiana even though Penn generated only 5.95% of its revenue in Indiana. And over the relevant three-year period, this would make Penn's income tax liability to Indiana more than its income tax liability to the seventeen other states in which Penn paid taxes *combined.*

The Department responds that none of these points matter because Penn concedes the Department applies a valid apportionment formula, which, the Department believes, ensures Indiana taxes no more revenue than is fairly apportioned to the State. Whatever the tax base, the Department points out, Indiana is taking only its 6–8% share based on the apportionment formula. That misses the key point, though—the apportionment formula does nothing to prevent a distortion of the underlying tax base to which the State applies the formula. The apportionment formula applies only after the tax base is calculated.

Indeed, that's why there is an add-back statute in the first place. Without it, the tax base would be artificially *deflated* before applying the apportionment formula, resulting in Indiana's apportionment being too small and its tax too low. But just as the base can be artificially deflated, it can also be artificially *inflated*, resulting in an apportionment that is too large and a tax that is too high.

In sum, our statutory interpretation aligns with both the conventional understanding among states with a corporate income tax and the underlying tax policy that produced the add-back statutes. Our interpretation also aligns with our precedent.

## III. Our precedent confirms the statute requires adding back only income taxes or their functional equivalent.

Our Court's precedent confirms Penn did not need to add back the disputed wagering taxes. And we do not find other tax court precedent or the legislature's subsequent decision to phase out any requirement to add

back wagering taxes as persuasive reasons to require Penn to add back the taxes here.

## A. *Consolidation Coal Company* supports our conclusion.

Our Court has interpreted this add-back statute only once before, in *Consolidation Coal Co. v. Indiana Department of State Revenue*, 583 N.E.2d 1199 (Ind. 1991). There, we considered whether "West Virginia's Business and Occupation Tax [was] a state tax 'based on or measured by income'" that had to be added back. 583 N.E.2d at 1200. During the tax years involved in *Consolidation Coal*, 1983 to 1985, West Virginia's business-and-occupation tax imposed an "annual privilege tax" on "business and other activities" that was "determined by the application of rates against values or gross income" as stated in the statute. *Id.* at 1202 (quoting W. Va. Code § 11-13-2 (1983)).

As we discussed above, these sorts of privilege taxes are the functional equivalent of income taxes, and in *Consolidation Coal* we held they had to be added back. We reasoned the statute requires "the add-back of taxes based on income but not those such as property or excise taxes." *Id.* In context, our reference could not have been to *all* "excise" taxes because the business-and-occupation taxes at issue were a form of excise tax, yet we held they had to be added back.

Instead, our analysis reflects that the West Virginia tax had to be added back because, even though it was an excise tax, it functioned like an income tax: Like an income tax, West Virginia's business-and-occupation tax in those years applied to a broad range of economic activity—everything from "the business of producing for sale, profit or commercial use any natural resource products" to "manufacturing, compounding or preparing any article or articles for sale, profit or com[m]ercial use." *Owens-Illinois Glass Co. v. Battle*, 154 S.E.2d 854, 857 (W. Va. 1967) (citing W. Va. Code § 11-13-2(a)–(b)). And a general business-activity tax may properly be treated "as 'simply a variety of a tax on income'" as opposed to a sales or excise tax that is not a functional equivalent of an income tax. Walter Hellerstein et al., *Commerce Clause Restraints on State Taxation After*

*Jefferson Lines*, 51 Tax L. Rev. 47, 86–90 (1995). Further, West Virginia's highest court instructed that the "provisions" of the business-and-occupation tax "are to be read and construed together and considered as a single statute." *Owens-Illinois Glass Co.*, 154 S.E.2d at 657.

These features are typical among business-and-occupation taxes. As with any tax, the details may vary, but the common feature is that they tax "general business activity," not specific transactions or activities. Hellerstein et al., *supra*, ¶ 6.03[3][a]. Washington, for example, imposes a business-and-occupation tax "on 'the act or privilege of engaging in business activities'" within its borders, generally measured by "the 'gross proceeds of sales.'" *Tyler Pipe Indus. v. Wash. State Dep't of Revenue*, 483 U.S. 232, 234–35 (1987) (quoting Wash. Rev. Code § 82.04.220 (1985)).

As with West Virginia's business-and-occupation tax in *Consolidation Coal*, this Washington tax applies to a broad range of activity like "extracting raw materials in the State, manufacturing in the State, making wholesale sales in the State, and making retail sales in the State." *Id.* at 235 (footnotes omitted) (quoting Wash. Rev. Code §§ 82.04.220, 82.04.240 (1985)). Because of the tax's "structure and reporting requirements," Washington says this tax "differs sharply from a sales or use tax," or, as our courts would put it, a conventional excise tax. *Lamtec Corp. v. Dep't of Revenue*, 246 P.3d 788, 794 n.6 (Wash. 2011) (en banc).

A leading tax treatise confirms there is "a much stronger case" for treating Washington's business-and-occupation tax as "analago[us]" to an income tax. Hellerstein et al., *supra*, ¶ 6.03[3][a]. In other words, a unified statutory framework imposing a tax on a broad range of business activities is properly viewed as the functional equivalent of an income tax. Indeed, the Department's own auditing manual instructs that Washington's business-and-occupation tax is to be added-back as a "state income tax." App. Vol. 3 at 146.

Now compare the tax added back in *Consolidation Coal* to the disputed West Virginia tax at issue here, which is a "tax on the privilege of holding a license to operate West Virginia Lottery table games." W. Va. Code Ann. § 29-22C-26. Rather than an annual, broad-based tax that applies generally to all aspects of West Virginia's economy, this tax applies to a "racetrack

table games licensee," paid in "weekly installments." *Id.* § 29-22C-26(a). Further, the tax is sandwiched between two sections dealing, respectively, with "inspection and seizure" concerning "criminal violations of" the Table Games Act, *id.* § 29-22C-25, and the "special fund in the State Treasury known as the West Virginia Lottery Racetrack Table Games Fund," *id.* § 29-22C-27.

What follows is that the taxes in *Consolidation Coal* were properly added back because they functioned like income taxes; they were part of West Virginia's broad framework to tax "general business activity" within that state. Hellerstein et al., *supra*, ¶ 6.03[3][a]. The West Virginia tax at issue here, in contrast, is nothing of the kind; it functions like a typical, transaction- or activity-based excise tax, not an apportioned income tax.

## B. We do not find the *Aztar* analysis to be a compelling reason to add back the taxes.

The Department relies heavily on *Aztar Indiana Gaming Corp. v. Indiana Department of State Revenue*, in which the Tax Court held that Indiana's Riverboat Wagering Tax—a daily tax "on the adjusted gross receipts received from gambling games"—had to be added back. 806 N.E.2d 381, 383, 386 (Ind. T.C. 2004). The Tax Court concluded that *Consolidation Coal* compelled this result because the court read our precedent as creating a dividing line between property and non-property taxes. *Id.* at 385. The court reasoned that because the gambling tax was a non-property tax, it had to be added back as one measured by income. *Id.* at 386.

We acknowledge that is a fair reading of *Consolidation Coal*, because we did say in that case that the statute requires "the add-back of taxes based on income but not those such as property or excise taxes." And we cited *Miles v. Department of Treasury*, 199 N.E. 372 (Ind. 1935), for the proposition that a critical distinction is whether the tax at issue is "a property or non-property tax," *Consolidation Coal Co.*, 583 N.E.2d at 1201–02, or, put another way, whether the tax is "measured by income" or "measured by value of property held." *Id.* But while that is a fair reading, we don't believe it is the best reading, and we therefore disapprove of it.

Rather, as we explained above, we believe the broader context—including the statutory purpose, the underlying tax principles, and the conventional understanding of this type of tax statute which is common across the country—reflects that the test is whether the tax is a direct income tax or its functional equivalent (i.e., an apportioned excise tax).

### C. We do not find the legislature's subsequent statutory changes to be a compelling reason to add back the taxes.

In 2017, the legislature amended the statute to phase out the add-back requirement for "wagering taxes." I.C. § 6-3-1-3.5(c). The Department argues this subsequent amendment shows the legislature believed wagering taxes were covered before.

Again, this is a fair argument, but we disagree. Subsequent legislative action is a "hazardous basis for inferring the intent of an earlier" legislature. *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (quotations omitted). And while we have said before that a statutory amendment "raises the presumption that the legislature intended to change the law," we've also said that is unless "the amendment was passed in order to express the original intent more clearly." *United Nat'l Ins. Co. v. DePrizio*, 705 N.E.2d 455, 460 (Ind. 1999). Given all the context we discussed above, we think it is more likely that the legislature was seeking to statutorily abrogate *Aztar* consistent with the statute's original understanding.

In sum, corporations must add back direct income taxes and taxes that are the functional equivalent of income taxes under Indiana Code section 6-3-1-3.5(b).

# Conclusion

For these reasons, we reverse the Tax Court and remand for entry of summary judgment in Penn's favor.

Rush, C.J., and Massa, Slaughter, and Goff, JJ., concur.

ATTORNEYS FOR PETITIONER

Mark J. Richards

Jenny R. Buchheit

Matthew J. Ehinger

Joshua W. Schlake

Ice Miller LLP

Indianapolis, Indiana

ATTORNEYS FOR RESPONDENT

Theodore E. Rokita

Attorney General of Indiana

Benjamin M. L. Jones

Samuel J. Dayton

Stephen J. Reen

Office of the Attorney General

Indianapolis, Indiana

ATTORNEYS FOR *AMICI CURIAE* COUNCIL ON STATE TAXATION
AND THE TAX FOUNDATION

Mark A. Loyd

Dentons Bingham Greenebaum LLP

Louisville, Kentucky

Stephanie M. Bruns

Dentons Bingham Greenebaum LLP

Indianapolis, Indiana

Helen V. Cooper

Dentons Bingham Greenebaum LLP

Louisville, Kentucky

ATTORNEY FOR *AMICI CURIAE* INDIANA LEGAL FOUNDATION,
INC. AND INDIANA CHAMBER OF COMMERCE

Randal J. Kaltenmark

Barnes & Thornburg LLP

Indianapolis, Indiana